IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 07-21123 |
| Computer World Solution, Inc., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | Honorable Jacqueline P. Cox |
| _____ | ) | |
| Computer World Solution Inc. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 08-00180 |
| | ) | |
| Apple Fund, L.P. and Astor Partners, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

On November 9, 2007 (the "Petition Date"), an involuntary petition for relief under

Chapter 11 of the Bankruptcy Code was filed against Computer World Solution, Inc. (the

"Debtor" or the "Plaintiff") in the United States Bankruptcy Court for the Northern District of

Illinois by creditors Wells Fargo, Fifth Third Bank and Yellow Freight, Inc. On November 16,

2007, the Debtor consented to the entry of an order for relief under Chapter 11 of the Bankruptcy

Code. On March 25, 2008, the Debtor filed adversary complaint 08-ap-00180 against Apple

Fund, L.P. ("Apple Fund") and Astor Partners, LLC ("Astor") (collectively, the "Defendants").

Count I of the complaint alleges that the Debtor made preferential transfers to the Defendants

that are avoidable under 11 U.S.C. § 547. Count II of the complaint requests recovery of the

transfers under 11 U.S.C. § 550(a)(1). Count III requests that the Defendants' claims against the

1

Debtor's bankruptcy estate be disallowed under 11 U.S.C. § 502(d) because the Defendants have

failed to repay the amount of the transfers in question. The complaint is based on three transfers

that the Debtor made to the Defendants between August and September of 2007 in the following

sums: Transfer #1 for $200,000 on August 14, 2007; Transfer #2 for $1,200,000 on August 28,

2007; and Transfer #3 which consisted of the Debtor's inventory (televisions and monitors) in

the month of September, 2007 that Apple Fund sold to a third party for approximately $103,204.

(Joint List of Stipulated Facts ¶ 19-23).

## BACKGROUND

The Debtor was a distributor of flat screen televisions and computer monitors; it

imported its goods from Asia. Transcript of First Day of Trial, January 20, 2010 at 55,

Computer World Solution, Inc. v. Apple Fund, LP and Astor Partners, LLC, 08-ap-00180

(hereinafter "Transcript 1"). The Debtor represented that it received goods and resold them to

retailers and that it provided goods by direct shipment from Asia to some of its vendors.[1]

Transcript 1 at 59-60. The Debtor's primary lender was Fifth Third Bank to whom it owed

approximately $17-20 million when the bankruptcy petition was filed. Transcript 1 at 98.

The parties' business history consists of a single loan transaction. (Joint List of

Stipulated Facts ¶ 39). On June 30, 2006, the Debtor executed a Promissory Note in favor of

Apple Fund for $2,200,000 (the "Promissory Note"). (Joint List of Stipulated Facts ¶ 4). On or

about June 30, 2006, Apple Fund loaned the Debtor $2,200,000 as evidenced by the Promissory

---

[1] In 2007 Staples placed an order with the Debtor for $16,000,000 worth of computer monitors, but the Debtor did not deliver the items in time for the retailer's Black Friday Thanksgiving Day Sale event. Transcript 1 at 162.

Note (the "Loan"). (Joint List of Stipulated Facts ¶ 5). The Loan's maturity date was June 30,

2007. (Joint List of Stipulated Facts ¶ 6). On or about June 29, 2007 the Debtor and Apple Fund

entered into a Loan Modification Agreement which extended the loan's maturity date from June

30, 2007 to August 10, 2007. (Joint List of Stipulated Facts ¶ 15-16). One of the conditions of

the modification was that the Debtor immediately pay $300,000 on the debt; that payment was

made on June 30, 2007 via wire transfer. Transcript of Second Day of Trial, January 21, 2010 at

11, Computer World Solution, Inc. v. Apple Fund, LP and Astor Partners, LLC, 08-ap-00180

(hereinafter "Transcript 2"); (Joint List of Stipulated Facts ¶ 17). Robert Stein ("Stein"), the sole

managing member of Apple Fund's general partner, Astor Partners, testified that the

modification might not have been granted if the $300,000 payment had not been made.

Transcript 2 at 10. The Loan Modification Agreement of June 29, 2007 was not satisfied on its

due date of August 10, 2007. Transcript 2 at 31. Apple Fund received a $300,000 payment on

June 30, 2007, as required by the Agreement as modified. Transcript 2 at 32. A Second Loan

Modification Agreement was also discussed at trial. It was not signed by the parties. The

Second Loan Modification Agreement extended the maturity date to August 31, 2007 and

provided as follows regarding the interest rate:

> 8.2.1: If the Borrower pays to Lender at least $1,200,000 of the total remaining
> outstanding principal amount on or prior to August 17, 2007, the Interest Rate due on the
> outstanding principal amount of the Loan shall be $1,000 per day for each and every day
> after August 10, 2007 through the Second Extended Maturity Date that any amounts
> remain due and owing under the Loan Documents, as modified.

> 8.2.2: If the Borrower pays to Lender at least 1,200,000 of the total remaining
> outstanding principal amount on or prior to August 24, 2007, the Interest Rate due on the
> outstanding principal amount of the Loan shall be $1,750 per day for each and every day
> after August 10, 2007 through the Second Extended Maturity Date that any amounts
> remain due and owing under the Loan Documents, as modified.

8.2.3: If the Borrower pays to Lender at least 1,200,000 of the total remaining outstanding principal amount on or prior to August 24, 2007, the Interest Rate due on the outstanding principal amount of the Loan shall be $3,000 per day for each and every day after August 10, 2007 through the Second Extended Maturity Date that any amounts remain due and owing under the Loan Documents, as modified.

8.3: The defined term "Default Rate" under the Note shall be amended to $5000 per day for each day after the Second Extended Maturity Date (or such lesser sum permitted by applicable law).

On September 25, 2007, Apple Fund initiated a Verified Complaint and Confession on Judgement Note (the "state court complaint") against the Debtor, in which Apple Fund sought a judgement on the Promissory Note and the Loan Modification in the amount of $493,591.00. On October 5, 2007, the Circuit Court of Cook County, Illinois entered a final judgment on the state court complaint in favor of Apple Fund and against Debtor Computer World Solution, Inc. in the amount of $493,955, plus post-judgment interest. (Joint List of Stipulated Facts ¶ 25 & 26).

The parties have stipulated to certain facts regarding the Transfers. The Transfers were made to Apple Fund during the preference period. (Joint List of Stipulated Facts ¶ 37). Neither of the Defendants provided the Debtor with any subsequent advances of funds, goods, or services after August 14, 2007, the date of Transfer #1. (Joint List of Stipulated Facts ¶ 27). The Transfers were made to or for the benefit of Apple Fund on account of an antecedent debt owed by the Debtor to Apple Fund before such transfers were made. (Joint List of Stipulated Facts ¶ 35-36). Prior to receiving the Transfers, Apple Fund engaged in collection efforts to obtain payment on account of the Loan. (Joint List of Stipulated Facts ¶ 24). The Defendants have not paid or transferred the cash Transfers or the value of the Inventory Transfers to the Debtor. (Joint List of Stipulated Facts ¶ 38).

At trial, the court ruled on several motions in limine before testimony began. The Debtor

brought two motions: a Motion in Limine to Preclude Defendants' Testimony and Evidence

Challenging Plaintiffs' Insolvency during the Preference Period and a Motion in Limine to

Preclude Testimony and Evidence Relating to Plaintiff's Purported Fraud Against Defendants.

The court granted the motion to preclude testimony and evidence challenging the Debtor's

insolvency because the Defendants admitted that the Debtor was insolvent in their response to

the Debtor's motion for summary judgement. Transcript 1 at 6. The Defendants argued that

their position on insolvency had changed because the Debtor's former officers pleaded the Fifth

Amendment when they were deposed regarding the Debtor's solvency. The court determined

that there was no reason to ignore the Defendants' judicial admission of the Debtor's

insolvency.[2] Transcript 1 at 8. In reliance on *Stoecker v. Mid American National Bank and

Trust Co., (In re Stoecker)* 131 B.R. 979 (N.D. Ill. 1991) the court granted the motion to exclude

Defendants' fraud Defenses. Fraud, equitable estoppel, judicial estoppel and unclean hands are

not valid defenses to a preference action under 11 U.S.C. § 547 (c).

The Defendants did not respond to the motion to exclude evidence relating to invalid

defenses and admitted that it was moot at trial. Transcript 1 at 18. Finally, the Defendants

brought a Motion to Approve the Testimony of Gary Dressler ("Dressler"). Mr. Dressler

prepared an appraisal for Apple Fund in 2007 and was listed on the Defendants' may-call

witness list. The Debtor argued that Mr. Dressler was never disclosed as a potential witness and

that the Debtor did not learn of his appearance until the Defendants' pre-trial material was

submitted, and thus the Debtor had no opportunity to depose or to interview Mr. Dressler.

---

[2] The court determined that the negative inference from Yuan and Gore's assertion of the Fifth Amendment
could not be drawn against the Debtor because the Debtor never exercised control over Yuan or Gore. The Debtor's
case was initiated as an involuntary case and Yuan and Gore never had an interest that was consistent with the
Debtor's.

Transcript 1 at 20. The Defendants countered that they would have mainly called Mr. Dressler

to testify regarding the Debtor's insolvency, and given the court's ruling on insolvency, his

testimony was less important. Transcript 1 at 21. The court denied the Defendants' motion but

granted the Defendants leave to call Mr. Dressler as a witness should they need his testimony

regarding an issue other than insolvency.

At trial, the Plaintiff presented documentary evidence in support of its prima facie case.

In evidence are the Joint List of Stipulated Facts (Docket No. 76, 08A180) and the Debtor's

schedules, showing assets of $4,122,949.16 and liabilities of $37,318,261.70 to establish

insolvency. Docket No.39, 07 B 21123. Also in evidence are the Defendants' Answers to

Plaintiffs' Statement of Facts in which the Defendants admitted that the Debtor was insolvent

during the preference period. (Plaintiff Ex. 5 at ¶ 33). The evidence includes two checks, the

first from Staples to the Debtor in the amount of $1,577,475 issued on August 15, 2007, and the

second from Butler Sales & Service, LLC to the Debtor in the amount of $4,140 also issued on

August 15, 2007. (Plaintiff Ex. 8). The Debtor argued that these checks were the source of the

funds for Transfer #1 and Transfer #2. *See* Plaintiff's Exhibit List, admitted into evidence on

January 21, 2010. Transcript 2 at 50.

The Plaintiff also offered the testimony of two witnesses at trial. The first witness was

Latifa Kulauzovic, the Assistant Branch Manager at the Citibank location where the Debtor

maintained an account. The second witness was Patrick O'Malley, (O'Malley) the Chief

Financial Officer and senior consultant at Development Specialists, Inc., the assignee of the

Debtor's assets since October 29, 2007.

Kulauzovic testified that she has been an Assistant Branch Manager at Citibank for

almost 10 years.  Transcript 1 at 32.  Kulauzovic also verified the authenticity of the Debtor's

bank statements that the Debtor admitted into evidence.  (Plaintiff's Ex. 7; Transcript 1 at 37).

She explained that the initial $1,200,000 check that the Debtor issued to Apple Fund was not

honored because the $1,577,475 check from Staples had not cleared.  Transcript 1 at 37-38.

Instead, a hold was placed on the check from Staples resulting in the funds not being available

when Apple Fund deposited the $1,200,000 check it received from the Debtor.  Transcript 1 at

37-38.

     O'Malley was the Plaintiff's expert witness in forensic accounting and business

restructuring.  O'Malley's background as a Certified Public Accountant and financial advisor to

companies in financial distress qualified him to testify as an expert witness regarding the

Debtor's pre-petition and post-petition financial affairs.  Transcript 1 at 47-49.  O'Malley

testified that he reviewed and managed the Debtor's financial affairs since his appointment as

assignee for the benefit of the Debtor's creditors on November 2, 2007.  Transcript 1 at 45-46.

O'Malley testified that in his capacity as assignee he reviewed the Debtor's records as far back

as 2005 and discovered that the Debtor's officers had engaged in fraud.  In support of the fraud

the Debtor created fictitious sales and accounts receivable and used these documents and

fraudulent information to obtain loans.  Transcript 1 at 60-62.

     Mr. O'Malley was retained by the Debtor pre-petition to help it find financing to replace

the Fifth Third Bank loan.  Transcript 1 at 57.  O'Malley's firm negotiated a forbearance

agreement with Fifth Third Bank because the bank had initiated proceedings against the Debtor.

Under that agreement the Debtor was supposed to cooperate and provide information to the

bank's auditors, including verification of its accounts receivable.  The Debtor was also required

to close its Citibank account and move all funds to Fifth Third Bank.  Mr. O'Malley's

examination of the Debtor's conduct and practices revealed that the Debtor's financial

statements were false, that the Debtor issued fraudulent invoices and that some of the Debtor's

purported customers were non-existent.  Mr. O'Malley discovered that there was no direct ship

business at all.  Transcript 1 at 60.  Mr. O'Malley's examination of the Debtor's inventory

disclosed that 10% of the boxes of purported merchandise in the Debtor's warehouse were

empty.  Transcript 1 at 64-65.  He discovered this when he tried to contact the Debtor's

purported customers to verify the accounts receivable.  Kevin Gore ("Gore"), the Debtor's chief

operating officer/ chief financial officer steered Mr. O'Malley towards the Debtor's smaller

customers.  Transcript 1 at 58.  Mr. Gore became an impediment to Mr. O'Malley's efforts.  Mr.

Gore was fired when Mr. O'Malley complained to Noel Yuan ("Yuan"), the Debtor's president.

O'Malley also discovered that the Debtor had overstated its sales for 2006 by $47,000,000.  He

concluded that the Debtor overstated its sales for 2007 by $63,000,000.  O'Malley testified that

this represented a massive fraud.  He filed amended tax returns on the Debtor's behalf and

secured a $1,000,000 federal income tax refund.  Transcript 1 at 84.

During his pre-petition work with the Debtor, Mr. O'Malley had been told that the

Citibank account was for international transactions.  Mr. O'Malley subsequently discovered that

the Citibank account was used to mask and hide transactions in an effort to conceal them from

Fifth Third Bank, the Debtor's primary lender.  Transcript 1 at 75.  Mr. O'Malley opined that the

separate Citibank account was used to perpetuate the fraud, and as part of the fraud, funds were

continually transferred back and forth between Fifth Third Bank and Citibank as support for the

fake accounts receivable.  He opined that the purpose of the Citibank account was to make

8

transfers like these and to keep them off the books. This was accomplished by altering the

Citibank statements. Mr. O'Malley testified that the Debtor used forged bank statements to

secure financing from its lenders.

With regard to the Debtor's dealing with Apple Fund, Mr. O'Malley testified that the

Debtor had not accounted for the Loan as a typical loan on its books and records. Transcript 1 at

67. It was recorded as a receivable from a non-existent customer.   Mr. O'Malley testified that

while the Debtor made required quarterly payments to Apple Fund, those payments were treated

as a commission expense and were not recorded in the company's books, records or financial

statements as loan payments. Transcript 1 at 78. The Transfers at issue herein were put in a

suspense account. Transcript 1 at 79. O'Malley opined that the treatment and recording of the

Debtor's payments to Apple and the Transfers were not ordinary. Transcript 1 at 79. This was

done to conceal the loan from the Debtor's senior, primary lender, Fifth Third Bank. Transcript

1 at 80. O'Malley also testified that the $200,000 August 14, 2007 and $1.2 million August 28,

2007 payments to Apple Fund were not reflected in the Debtor's fake bank statements. He

verified the payments through examination of the records of the Citibank account. O'Malley

testified that it was his expert opinion that there was nothing ordinary about how the Loan was

treated by the Debtor. Transcript 1 at 69.

Mr. O'Malley also opined that it was unusual that Apple Fund did not file a UCC

financing statement and noted that normally, where there is a second lender, he would expect a

subordination agreement or an intercreditor agreement between the lenders, neither of which

exists for the loan herein. Transcript 1 at 179. There was also a question raised at trial about

whether the interest rate on the Apple Fund loan was usurious. Illinois' usury statute 815 ILCS

9

205/4 ILCS provides that it is lawful to charge any rate of interest in connection a loan made to a corporation, which the Debtor declares itself to be in its bankruptcy petition. Therefore, there is nothing unordinary about the interest rate charged on the funds loaned by Apple Fund.

Finally, O'Malley testified that Apple Fund received more during the preference period than it would have in a Chapter 7 liquidation and distribution. Transcript 1 at 87-88. Instead of receiving almost 75 cents on the dollar as it did during the preference period, O'Malley testified that Apple Fund would have received only 9 cents on the dollar in a liquidation and distribution of the Debtor's assets.

Mr. Stein testified for the Defendants. Mr. Stein opined that at the Loan's inception the Debtor wanted a term of more than one year and that he did not expect payment on the due date. Transcript 2 at 15-17. Mr. Stein did not know whether the Second Loan Modification Agreement was ever executed. Transcript 2 at 96. Mr. Stein testified that although the Second Loan Modification is unsigned, the parties acted as if they had signed it. Transcript 2 at 20.

Mr. Stein also testified that his firm has previously modified loans by extending them and charging interest upon modification as it has done regarding the Debtor. However, he could not say how others in the lending industry conducted loans such as these. Transcript 2 at 26. He does not hold himself out as an expert in lending; he is an expert in investment management.

Transcript 2 at 26.

Mr. Stein testified that after Apple Fund received the $1.2 million transfer it claimed additional amounts, but received no further cash or wire transfers from the Debtor. However, Apple Fund then received the Debtor's inventoried items on one or more occasions in September

10

2007. He also testified that it was not ordinary for his firm to pick up inventory and that they

had not picked up inventory before from Apple Fund's other borrowers. Transcript 2 at 38. Mr.

Stein was not aware that the inventory collateral that Apple Fund seized could have been Fifth

Third Bank's collateral under that lender's blanket lien. Transcript 2 at 106-107.

### Discussion

**Plaintiff's *Prima Facie* Case**

To obtain judgment, the Plaintiff must satisfy the requirements of Section 547(b) of the

Bankruptcy Code which governs avoidable preferential transfers. Section 547 provides as

follows:

> (b) Except as provided in subsection (c) and (i) of this section, the trustee may avoid any
> transfer of an interest of the debtor in property–
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was
> made;
> (3) made while the debtor was insolvent;
> (4) made–
> (A) on or within the 90 days before the date of the filing of the petition; ...
> (5) that enables such creditor to receive more than such creditor would receive if –
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions
> of this title.

11 U.S.C. § 547(b).

In this case, the Plaintiff has met its burden and proven all of the elements of a

preferential transfer regarding each of the Transfers. Apple Fund stipulated to several of the

Section 547 elements in the parties' Joint List of Stipulated Facts, including the following: (1)

Apple Fund was a creditor of the Debtor at the time of the Transfers; (2) the Transfers were

made to or for the benefit of Apple Fund; (3) the Transfers were made during the preference

11

period; and (4) the Transfers were made to Apple Fund on account of an antecedent debt owed

by the Debtor to Apple Fund before such transfers were made.  (Joint List of Stipulated Facts ¶

34-37).  Apple Fund also admitted that the Debtor was insolvent during the preference period in

its response to the Debtor's motion for summary judgement.  Thus, the Debtor only had to prove

two Section 547 elements at trial - that the Transfers were interests of the Debtor in property and

that the Transfers enabled Apple Fund to receive more than it would have received if this case

was a Chapter 7 liquidation.

    The Defendants denied that Transfer #1 and Transfer # 2 consisted of an interest of the

Debtor in property by raising the earmarking doctrine as an affirmative defense.  However, the

earmarking doctrine is not an affirmative defense pursuant Section 547 of the Bankruptcy Code,

it is a challenge to a plaintiff's ability to prove its *prima facie* case. *See Kmart Corp. v. Undien

Am. Corp.* (*In re Kmart Corp.*), 2004 WL 2222265, *3 (N.D. Ill. 2004). The earmarking doctrine

"is applicable only where a third party lends money to the debtor for the specific purpose of

paying a selected creditor", and as a result that third party "simply substitutes itself for the

original creditor." *Smith v. Boyer*, 966 F.2d 1527, 1533 (7th Cir. 1992). An earmarked transfer

is not a preferential transfer because "(1) the debtor never exercises 'control' over the new funds;

and (2) the debtor's property (i.e. the fund out of which creditors can be paid) is not diminished."

*Id.*  The Defendants alleged that the earmarking doctrine was applicable to the cash transfers

(Transfer #1 and Transfer #2) because the funds were given to the Debtor by Noel Yuan's family

in China to pay Apple Fund. However, the evidence presented at trial negated the Defendants'

earmarking argument and proved that the cash transfers came from payments that the Debtor

received from Staples, on August 20, 2007, and from Butler Sales, (Butler) not from Mr. Yuan's

family.  First, Ms. Kulauzovic testified that the funds in the Debtor's bank account that were

used to pay Transfer #2 of $1.2 million came from a $1,577,475 million check from Staples.

Transcript 1 at 39.  Mr. O'Malley testified that the source of Transfer #2 was the check that the

Debtor received from Staples as payment for goods sold.  Transcript 1 at 71-72.  The earmarking

doctrine is inapplicable here because Transfer #1 and Transfer #2 were made to Apple Funds

from monies over which the Debtor exercised complete control and ownership.  Based on the

testimony provided by Ms. Kulauzovic and Mr. O'Malley and the checks from Staples and

Butler (amounting to a refund) that the Debtor introduced into evidence, the funds used to pay

Transfer #1 and Transfer #2 were deposited directly into the Debtor's bank account as payment

for general business transactions.  There was no testimony or evidence presented to show that

these funds were specifically earmarked for Apple Fund from Yuan's family.  The court finds

that the Debtor presented sufficient evidence and testimony at trial to prove that the Debtor had a

property interest in the funds used for Transfer #1 and Transfer #2 and that the earmarking

doctrine does not apply to those funds.

The court also finds that the Debtor presented sufficient evidence at trial to prove that

Apple Fund received more from the preferential Transfers than it would have in a Chapter 7

liquidation and distribution.  The standard for determining whether a creditor received more

from preferential transfers than it would have in a Chapter 7 liquidation is "whether the general

unsecured creditors would receive less than 100% recovery on their claims."  *In re MarchFirst,*

*Inc.,* 381 B.R. 689, 695 (Bankr. N.D.Ill. 2008) (internal citations omitted).   Generally, "so long

as the distribution to creditors in a bankruptcy case is less than 100%, 'any payment on account

to an unsecured creditor during the preference period will enable that creditor to receive, for

preference-avoidance purposes, more than it would have received in a hypothetical chapter 7 liquidation had the payment not been made.'" *Id.* (internal citations omitted). Here, the Debtor's schedules clearly show that Debtor's liabilities ($37,318,261.70) greatly outweighed its assets ($4,122,949.16) so general unsecured creditors will receive much less than 100% on their claims. Mr. O'Malley testified that Apple Fund would have received only 9 cents on the dollar in a Chapter 7 liquidation compared to the 75 cents on the dollar Apple Fund received from the Transfers. Transcript 1 at 87-88.

**Ordinary Course of Business Defense**

The Defendants assert an Affirmative Defense of ordinary course of business pursuant to 11 U.S.C. § 547(c)(2). Section 547 provides as follows for establishing an ordinary course of business defense:

> (c) The trustee may not avoid under this section a transfer--
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
> (A) made in the ordinary course of business or financial affairs of the debtor and transferee; or
> (B) made according to ordinary business terms.

The Defendants must prove that the debt for which the transfer was made was incurred in the ordinary course of business between the debtor and creditor and either that (1) the transfer was made in the ordinary course of business of the parties or (2) the transfer was made according to ordinary business terms in the creditor's industry. The court finds that the Defendants failed to set forth sufficient evidence to prove any prong of the ordinary course of business defense, as discussed below.

1.    <u>Debt Incurred in Ordinary Course of Both the Debtor and Creditor</u>

14

Pursuant to 11 U.S.C. § 547 (c)(2), the Defendants have to prove that the Transfers were made "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." Based on the testimony of Mr. O'Malley, the Loan was not incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and Apple Fund. The Debtor did not reflect on its books and records that it had received a loan from Apple Fund. Instead, the money received from Apple Fund on account of the Loan was recorded as cash received on account of an outstanding accounts receivable. Furthermore, the Transfers in issue were never recorded on the Debtor's books and were instead placed in a suspense account. Transcript 1 at 78.

When the Debtor received the $2,200,000 loaned funds from the Defendants, the funds were reflected on the Debtor's records as an account receivable from Insight Enterprises ("Insight") as a sale of merchandise rather than as a loan from Apple Fund. Mr. O'Malley testified that Insight was a fictitious customer and that the loan proceeds were used to support one of the fraudulent sale transactions. Transcript 1 at 188-189.

The circumstances surrounding the Loan's inception and repayment and its subsequent recording in the Debtor's books and records are fraudulent. A debt cannot be incurred in the ordinary course of business where the Debtor engaged in fraudulent conduct. *See, e.g., Henderson v. Buchanan*, 985 F.2d 1021, 1025 (9th Cir. 1993) (determined that the ordinary course of business defense is not applicable to Ponzi scheme investors because a Ponzi scheme is not a business; *Jobin v. McKay (In re M&L Bus. Mach. Co.)*, 84 F.3d 1330, 1339-40 (10th Cir. 1996) (determined that the ordinary course of business defense is not applicable to payments by a fake business set up to defraud people). This court finds that the debt was not incurred in the

15

ordinary course of business due to the fraud surrounding the Loan. The purpose of the ordinary

course defense is to leave undisturbed normal financial relations, because it does not detract

from the general policy of the preference section to discourage unusual action by either the

debtor or his creditors during the debtor's slide into bankruptcy. S.Rep. No. 95-989. 95th Cong.,

2d Sess. 88 (1978). 1978 US Code Cong. & Admin.News, p.5874.

The Defendants have failed to satisfy the 11 U.S.C. § 547(c)(2) requirement that the

transfer be in payment of a debt incurred by the debtor in the ordinary course of business or

financial affairs of the debtor and the transferee.

2.    <u>Transfer Made According to Ordinary Course of Business of the Parties</u>

Pursuant to 11 U.S.C. § 547 (c)(2)(A), for transfers to be eligible for the exception to

liability they have to be "made in the ordinary course of business or financial affairs of the

debtor and the transferee." Here, the Loan transaction between the Debtor and Apple Fund is the

only business transaction between the parties. The Seventh Circuit provides guidance in *Kleven*

*v. Household Bank F.S.B.* regarding how to assess the ordinary course of business between the

parties when the parties' business history consists of a singe transaction. In *Kleven*, the Seventh

Circuit affirmed a finding that one business transaction between the parties was enough to

determine that the transfers at issue were made in the ordinary course of business of the parties

and thus could not be avoided as preferential. 334 F.3d 638 (7th Cir. 2003). The single

transaction involved a refund anticipation loan ("RAL") which the debtor applied for and

obtained during the preference period. *Id.* at 639. The debtor received a loan against his

forthcoming tax refund and established a bank account with the lender so that the lender would

automatically receive the debtor's electronic federal income tax refund and apply it to the loan.

16

*Id.* at 640.

In determining whether the transaction was ordinary as between the lender and the debtor, the court considered several factors:

(1) the length of time the parties were engaged in the transaction at issue;

(2) whether the amount or form of tender differed from past practices;

(3) whether the debtor or creditor engaged in any unusual collection or payment activity; and

(4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Id.* at 642. While the court stated that the strongest factor supporting a determination that business as between the debtor and creditor is ordinary is the history of dealing between the parties, the court noted that "[i]n some instances ... the ordinary course of business may be established by the terms of the parties' agreement , *until that is somehow or other modified by actual performance.*" *Id.* at 643 (emphasis added).   Because there was no modifying behavior between the *Kleven* debtor and creditor, the Seventh Circuit determined that it was appropriate to "look to the terms of the parties' agreement in order to determine their ordinary course of business." *Id.* After looking to the RAL agreement between the parties for guidance, the court found that because the transaction at issue was conducted according to the parties' agreement with regard to timing and manner, the transfers were ordinary as between the parties. *Id.*

Using the Seventh Circuit's principles in *Kleven* as a guide, the court cannot conclude that the Transfers were made in the ordinary course of business between the Debtor and Apple Fund. Although, like the debtor and creditor in *Kleven*, the Debtor's and Apple Fund's business history consisted of a single transaction, the transactions between Apple Fund and the Debtor are

17

not similar to the transactions in *Kleven* for several reasons.  First, as the parties stipulated,

Apple Fund engaged in collection efforts on account of the Loan.  The Seventh Circuit noted in

*Kleven* that engaging in unusual collection activity was one of the factors to consider when

determining whether the transaction was ordinary as between the parties.  *Id.* at 642.  This court

finds that Apple Fund engaged in unusual collection activity when it initiated collection efforts

against the Plaintiff and obtained a state court judgment against the Debtor for monies owed on

account of the Loan.  Second, the Seventh Circuit also noted in *Kleven* that looking to the terms

of the parties' agreement to establish the ordinary course of business is appropriate in the

absence of modifying behavior.  *Id.* at 643.  However, in the instant case modifying behavior is

present.  The parties entered into two loan modifications which altered their agreement.  One

modification occurred in June, 2007 well before the preference period.  The second modification

occurred on August 10, 2007 one day before the preference period began. According to the

Complaint the preference period began on August 11, 2007.  Plaintiff's Adversary Complaint at

¶ 1.

The Seventh Circuit addressed the issue of whether payments that are late in violation of

the terms of the parties' agreement can ever be in the ordinary course of business. *In the Matter

of Xonics Imaging, Inc.*, 837 F.2d 763, 766 (7th Cir. 1988).  Prior to the preference period the

*Xonics* debtor made one timely pre-petition payment to the creditor. *Id.* at 767.  However, during

the preference period all of the debtor's payments were late by the terms of the parties initial

agreement and subsequent modifications.  *Id.* at 766.  In turn, the Seventh Circuit held that "the

conduct of the debtor, after becoming insolvent, in failing to make payments within the time

required by its contract with the creditors is presumptively nonordinary." *Id.* at 767.  The court

determined that this presumption was triggered by the conduct of the *Xonics* debtor and that the

creditor failed to carry its burden of proving that the late payments were in the ordinary course of

the business of the debtor. *Id.*

       Similarly, this court finds that the parties' conduct during the preference period triggers

the nonordinary presumption noted in *Xonics*. Pursuant to the original contract between the

Debtor and Apple Fund, payment of the loan was due in full by June 30, 2007. Like the debtor

in *Xonics*, the Debtor made timely quarterly payments to Apple Fund outside of the preference

period pursuant to the Promissory Note. One day before the maturity date of the Loan, the

parties entered into a Loan Modification Agreement which extended the due date to August 10,

2007. According to Mr. Stein, the Loan Modification Agreement was not satisfied by its

maturity date, August 10, 2007, causing the parties to enter into the unsigned Second Loan

Modification Agreement on August 10, 2007, according to that document. Transcript 2 at 31.

Although Apple Fund received a $200,000 payment from the Debtor on or around August 14,

2007, this payment was not provided for in either of the Loan Modification Agreements. Each

modification required full repayment of the Loan by each Maturity Date; the Loan was not

repaid by August 10, 2007 or by August 31, 2007. Looking to the agreements to assess

ordinariness, Transfer #1 was not made pursuant to the parties' agreement. Transcript 2 at 32.

During the preference period the Plaintiff made the Transfers at issue herein but they did not

satisfy the requirement that the loan be fully repaid by the due dates. This court finds that the

Debtor's failure to make full payment during the preference period triggers the *Xonics*

nonordinary presumption because the Agreements were violated. After receiving Transfer #2 of

$1.2 million, but before the Debtor filed for bankruptcy, Apple Fund initiated a state court action

19

against the Debtor and was awarded $493,955.00 on account of the Debtor's failure to make

payments pursuant to the Loan and its subsequent modifications. This collection effort was not

ordinary; it occurred during the preference period.

In *Roberds v. Broyhill Furniture* (*In re Roberds*), the Sixth Circuit set forth instructive

guidelines for use in determining whether transfers were made in the parties' ordinary course of

business. 315 B.R. 443, 458 (6th Cir. 2004). The guidelines are as follows:

| POTENTIALLY ORDINARY CREDITOR ACTIVITY | POTENTIALLY *NOT* ORDINARY CREDITOR ACTIVITY |
|---|---|
| **creditor question**<br><br>When will payment due according to the existing terms be received? - even if this question concerning payment had never been previously asked. | If payment for an antecedent debt is not received according to its terms and any one, or some or all of the following activities are present, the payment may not be in the ordinary course of the parties' business: |
| **creditor communication**<br><br>There is increased concern about receipt of | 1. creditor change from prior or existing credit *terms*. |
| payment due according to existing terms – even if such a concern had never been | 2. creditor change from prior or existing *limits*. |
| previously expressed.<br><br>**creditor frequency** | 3. creditor change from prior or existing *sales* of goods and services. |
| There are repeated requests for payment or expressions of concern about payment due | 4. creditor change from prior or existing *shipment* of goods and services. |

20

| | |
|---|---|
| according to existing terms – even if there had never been such repeated requests. | 5. creditor change from the existing required *amounts* of payments to be made. |
| **identity of creditor contact**<br><br>There is contact by senior management or a | 6. creditor change from the existing required *timing* of payments to be made. |
| creditor representative with increased authority involving credit decisions concerning payment due according to existing terms – even if there was never such contact by such senior management or a creditor representative. | 7. creditor changes in *future* credit terms, limits, sales, shipments, the amount of payments required or the timing of payments. |

The Sixth Circuit's guidelines in *Broyhill* take into account the delicate balance between collection activities designed to protect the creditor and its business and collection activities that are out of the ordinary. As the Sixth Circuit recognized in *Broyhill*, creditors may have to engage in collection activities in the ordinary course of business to protect themselves and receive payment. However, when a creditor engages in modifying behavior and changes some aspects of the parties agreement, these changes are likely not ordinary creditor activity. Here, Apple Fund engaged in collection activity in addition to modifying behavior. Apple Fund and the Debtor entered into two loan modifications that changed the terms of their agreement. As part of these loan modifications the amounts of payments to be made changed and the timing of the payments also changed. For instance, the first loan modification triggered a $300,000 payment from the Debtor to Apple which was not contemplated by their initial agreement. In

addition, the maturity date of the loan changed from June 30, 2007 to August 10, 2007. The

second loan modification extended the Loan's maturity date from August 10, 2007 to August 31,

2007. Consistent with the Sixth Circuit's guidelines in *Broyhill*, this court finds that the multiple

changes that modified the agreement between Apple Fund and the Debtor went beyond ordinary

collection efforts and significantly changed the parties' payment practices. Transfer #1 on

August 14, 2007 which was made during the preference period resulted from nonordinary

collection activity, mainly the two agreement modifications. Transfer #2 on August 28, 2007

which was made during the preference period resulted from the same nonordinary collection

activity. Therefore, the transfers were not made in the ordinary course of business of the parties.

The court wants to address an argument raised by the Defendants in their closing remarks

regarding the Debtor's ordinary course of business being fraudulent. The Defendants' attorney

argued:

> But the interesting thing that I take from that is if you really think about it, the ordinary
> course of business, they kind of can't have it both ways, which is if this was such a fraud
> that started in 2005, long before this loan was even made, to the tune, as Mr. O'Malley
> said yesterday, that they booked $80 million, approximately $80 million of revenue, of
> which $60 million was bogus, that they had approximately $20 million of real sales, $60
> million in fake sales, well, if that's really the case, and they're hanging their hat on the
> fact that, well, they booked the loan as if it wasn't a loan, as if it was something else, then
> it actually begs the interesting question, if the business is so fraudulent, and such – and
> such – such bad record keeping, then in a sense this loan was also made in the ordinary
> course of their fraudulent business at the end of the day. So if that's how they conducted
> business since long before this loan was made, then it was paid as they normally conduct
> a fraudulent business. So either way, either this loan was repaid in strict accordance with
> the business terms, the loan terms I should say, or if not, if it was so out of whack, it was
> repaid in conformance with the business that conducts – I mean, it's not something you
> see every day, but it was paid in conformance with the business that conducts a massive
> fraud and has lots and lots of victims, including Apple Fund.

Transcript 2 at 163-165. This court notes that the exception to preference liability applies to

payments by a real business, not payments by a fraudulent business. The measure of business

conduct for purposes of this defense should be limited to the legitimate practices of legitimate

businesses. This court declines to apply the Defendants' reasoning; ordinary businesses do not

pay fictitious profits or systematically defraud their customers. *See, e.g., Jobin v. McKay*, 84

F.3d 1330, 1339-1340 (10th Cir 1996) (held that ordinary businesses do not pay fictitious

profits).

This court finds that Apple Fund's collection activity and the parties' modifying behavior

with regard to the First and Second Loan Modifications show that the Transfers were not made

according to the ordinary course of business of the parties. Based on this activity the court

concludes that the Transfers are nonordinary. Therefore, the Defendants failed to meet their

burden on this element of the ordinary course of business defense which requires that the

transfers be made in the ordinary course of business of the parties.

3.    <u>Transfer Made According to Ordinary Business Terms</u>

The term "ordinary business terms" in 11 U.S.C. § 547(c)(2)(B) refers to "a range of

payment terms encompassing the practices of firms similar to that creditor." *In re MarchFirst*,

381 B.R. at 696. In turn, the Seventh Circuit has determined that in order for a creditor to

prevail on this element of the ordinary course of business defense, "the creditor need establish

only that its own dealings with the debtor are situated within the outer limits of normal industry

practice.'" *In re Matter of Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir. 1995). The Seventh

Circuit further explains that satisfaction of the ordinary business terms element "requires proof

beyond what is normal between the debtor and the creditor: The creditor must also show that the

disputed payment was made according to terms that are ordinary when compared to those

employed by other firms in the same industry." *In re Matter of Midway Airlines, Inc.*, 69 F.3d at

23

798 (citing *In re Tolona Pizza,* 3 F.3d 1029, 1032-33 (7th Cir. 1993)).

Nothing was presented in support of the allegation that the Transfers between Apple Fund and the Debtor were made according to terms that are ordinary when compared to terms used by firms in the same industry. The sole witness that the Defendants presented at trial, Robert Stein, admitted during his testimony that he could not comment on how other banks or firms in the industry handle loans of the kind that Apple Fund made to the Debtor. Transcript 2 at 26. While Mr. Stein was able to provide general testimony regarding Apple Fund's practices with other customers and the Debtor, the Seventh Circuit "requires proof beyond what is normal between the debtor and the creditor" to satisfy the ordinary business terms element of the ordinary course of business defense. *See In re Midway Airlines, Inc.*, 69 F.3d 798. Mr. Stein's testimony regarding industry practices was wholly inadequate because he never explained how the Transfers were made according to terms that are ordinary when compared to those employed by other firms in the same business. The Defendants failed to advance any evidence to prove that the Transfers were made according to ordinary business terms. Therefore, the Defendants' Affirmative Defense that the Transfers were made according to ordinary business terms under section 547(c)(2)(B) fails.

**Remaining Affirmative Defenses**

The Defendants asserted the following affirmative defenses in their answer to the adversary complaint:

1.  The alleged Transfers are not avoidable to the extent that they do not involve a transfer of an interest of the Debtor in property.

2.  The alleged Transfers are not avoidable to the extent that they were not made

within the preference period.

3.    The alleged Transfers are not avoidable to the extent that any such payments

were: (a) intended by the Debtor and Apple Fund to be contemporaneous

exchanges for new value given to the Debtor in the form of forbearance

agreements or otherwise; and (b) were in fact substantially contemporaneous

exchanges.

4.    The alleged Transfers were in payment of debt incurred by the Debtor in the

ordinary course of business or financial affairs of the Debtor and Apple Fund and

were made (2) in the ordinary course of business or financial affairs of the Debtor

and Apple Fund, or (b) according to ordinary business terms.

5.    The alleged transfers are not avoidable to the extent that after such payments were

made, Apple Fund gave new value, either in the form of an agreement to forbear

or otherwise, to or for the benefit of the Debtor, which new value was: (a) not

secured by an otherwise unavoidable security interest; (b) on account of which

new value the Debtor did not make an otherwise unavoidable transfer to or for the

benefit of the Defendants.

6.    The alleged Transfers are not avoidable to the extent that they create a perfected

security interest in inventory or a receivable or the proceeds of either not

otherwise excepted within the limitations of 11 U.S.C. § 547 (c)(5).

7.    To the extent that the Debtor and/or its officers, directors, employees or

shareholders perpetuated a fraud on and upon the Defendants whereby they

allowed for the passage of time in order to perpetuate said fraud, the Complaint is

25

barred by laches.

8.    To the extent that the Debtor and/or its officers, directors, employees, or shareholders perpetuated a fraud on and upon the Defendants, the Complaint is barred by the doctrine of estoppel.

9.    To the extent that the Debtor and/or its officers, directors, employees, or shareholders perpetuated a fraud on and upon the Defendants, the Complaint is barred by the doctrine of judicial estoppel.

10.    To the extent that the Debtor and/or its officers, directors, employees, or shareholders perpetuated a fraud on and upon the Defendants, the Complaint is barred by the doctrine of unclean hands.

11.    To the extent the Transfers originated from or on behalf of parties other than the Debtor, the alleged Transfers are not avoidable to the extent they are protected by the earmarking doctrine,

12.    Defendants are entitled to set off any liability imposed upon it in this action by: (a) any sums due to Defendants as a dividend from the bankruptcy estate for any pre-petition unsecured claims of Defendants; and (b) any amounts due Defendants as a dividend from the bankruptcy estate as a result of any recovery herein.

13.    Defendants reserve their rights to add additional affirmative defenses that may be ascertained during the course of this litigation.

On June 5, 2008 the Debtor initiated a Motion to Strike Certain of Defendants' Affirmative Defenses. Computer World Solutions, Inc. v. Apple Fund, LP and Astor Partners, LLC, 08-ap-00180, Docket No. 19. On June 17, 2008, this court entered an order striking the

Defendants' Second and Thirteenth Affirmative Defenses and requiring that the Defendants re-

plead their First, and Sixth Affirmative Defenses within fourteen days of the entry of the order.

The order also required the Defendants to re-plead their Seventh, Eighth, Ninth, and Tenth

Affirmative Defenses by March 23, 2009. Computer World Solutions, Inc. v. Apple Fund, LP

and Astor Partners, LLC, 08-ap-00180, Docket No. 21. The Defendants have not re-plead the

First, Sixth, Seventh, Eighth, Ninth or Tenth Affirmative Defenses as required by this court's

order. Due to the Defendants' failure to re-plead these Affirmative Defenses in a timely manner

the First, Sixth, Seventh, Eighth, Ninth and Tenth Affirmative Defenses are not in issue.

The Defendants' Second Affirmative Defense that the alleged Transfers are not avoidable

to the extent that they were not made within the preference period fails. The parties have

stipulated that the Transfers occurred during the preference period. (Joint List of Stipulated

Facts ¶ 37).

The Defendants' Third Affirmative Defense that the alleged Transfers are not avoidable

to the extent that any such payments were: (a) intended by the Debtor and Apple Fund to be

contemporaneous exchanges for new value given to the Debtor in the form of forbearance

agreements or otherwise; and (b) were in fact substantially contemporaneous exchanges fails.

The parties stipulated that nothing was exchanged between the parties after the loaned funds

were transferred to the Debtor. (Joint List of Stipulated Facts ¶ 27).

The Defendants' Fourth Affirmative Defense, the ordinary course of business defense,

fails. Its failure has been discussed herein.

The Defendants' Fifth Affirmative Defense that the alleged transfers are not avoidable to

the extent that after such payments were made, Apple Fund gave new value, either in the form of

27

an agreement to forbear or otherwise, to or for the benefit of the Debtor, which new value was:
(a) not secured by an otherwise unavoidable security interest; (b) on account of which new value
the Debtor did not make an otherwise unavoidable transfer to or for the benefit of the Defendants
fails.  The parties stipulated that no new value was exchanged between the parties following the
2006 Loan.  (Joint List of Stipulated Facts ¶ 27).  The law does not recognize forbearance as a
defense to a preference claim; several bankruptcy courts have determined that forbearance of a
right does not constitute new value.  *In re Duffy*, 3 B.R. 263, 266 (Bankr.S.D.N.Y.1980) (car
lessor's forbearance from repossessing vehicle did not constitute new value); *Wolinsky v. Central
Vt. Teachers Credit Union (In re Ford)*, 98 B.R. 669, 684 (Bankr.D.Vt.1989) ("[F]orbearance,
whether consensual/nonconsensual, direct/indirect, unilateral/bilateral, or
intentional/unintentional, may not constitute new value under § 547(a)(2) for § 547(c)(4)
purposes").

   The Defendants' Eleventh Affirmative Defense, the earmarking defense, fails.  Its failure
has been discussed herein.

   The Defendants' Twelfth Affirmative Defense alleges that the Defendants have a right of
setoff against sums due them on claims against the estate and any preference liability.  Only
defenses noted in 11 U.S.C. section 547(c) are allowable to avoid preference liability.  The
defense of setoff is not provided for in Section 547(c).  *In re Stoecker*, 131 B.R. 979, 984 (Bankr.
N.D. Ill. 1991).

   The Defendants' Thirteenth Affirmative Defense reserved their right to file additional
defenses; none were filed.

## CONCLUSION

The court finds that the Debtor met its burden under 11 U.S.C. § 547 and proved that the Transfers were in fact preferential by a preponderance of the evidence. None of the Defendants' defenses have been sustained by a preponderance of the evidence and thus this court enters judgment in favor of the Plaintiff. On Count I the court finds that the following three transfers are avoided:

(1) $200,000 dated August 14, 2007;

(2) $1,200,000 dated August 28, 2007; and

(3) $103,204 represented by the transfer of inventory during September, 2007.

Plaintiff is granted judgement on Count I in the amount of $1,503,204 together with interest pursuant to 28 U.S.C. section 1961, together with the costs of this proceeding.

On Count II judgment is entered in favor of the Plaintiff. The Plaintiff may recover the property avoided in Count I from the Defendants, Apple Fund, L.P. and Astor Partners, L.L.C.

Count III asks the court to disallow the Defendants' claims against the Bankruptcy estate because the preference claims have not been paid pursuant to 11 U.S.C. section 502(d). The Defendants have not filed claims against the bankruptcy estate. No relief under Count III is called for.

The Debtor's Motion for Summary Judgment, which was heard by the court concurrent with the trial, is denied. The court finds that the several issues of fact noted herein precluded the entry of summary judgment.

The court denied the Defendants' oral request to delay the trial to enforce a subpoena served on Danny Zoller ("Zoller"). This adversary proceeding had been pending by the date of

29

this oral request for 22 months.  At the start of trial the court was not informed that Mr. Zoller's

attendance at trial would be a problem.  The court noted on page 130 of Transcript 2 that if she

had been told of this problem at the outset of the trial on January 20, 2010 that she would have

delayed the trial to enforce the subpoena.  The Defendants' attorney stated that Mr. Zoller was in

California when the trial began.  The court had no proof that Mr. Zoller was in California, and

notes that the witness could have been deposed under Federal Rule of Bankruptcy Procedure

7032, which might have allowed the admission of the witness' deposition testimony at the trial.

The court was told his testimony would be cumulative.  Transcript 2 at 131.

The effort to continue the trial of the matter at its conclusion may have been another

attempt to delay this matter.  The Defendants continued the trial of this matter several times to

depose the Debtor's principals, Yuan and Gore, who asserted their Fifth Amendment privileges

against self-incrimination adding nothing to the resolution of this case.

**Dated:  March 17, 2010**

**ENTERED:**  *Jacqueline P. Cox*
J. P. Cox

_____

**Jacqueline P. Cox**
**United States Bankruptcy Judge**