## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|                                               |     |                                   |
| --------------------------------------------- | --- | --------------------------------- |
| In re:                                        | )   |                                   |
|                                               | )   | Case No. 07-21123                 |
| Computer World Solution, Inc.,                | )   |                                   |
|                                               | )   | Chapter 11                        |
| Debtor.                                       | )   |                                   |
|                                               | )   | Honorable Jacqueline P. Cox       |
| _____        | )   |                                   |
| Computer World Solution, Inc.                 | )   |                                   |
|                                               | )   |                                   |
| Plaintiff,                                    | )   |                                   |
|                                               | )   |                                   |
| v.                                            | )   | Adversary No. 08-00180            |
|                                               | )   |                                   |
| Apple Fund, L.P. and Astor Partners, LLC,     | )   |                                   |
|                                               | )   |                                   |
| Defendants.                                   | )   |                                   |

### AMENDED MEMORANDUM OPINION

On November 9, 2007, an involuntary petition for relief under Chapter 11 of the Bankruptcy Code was filed against Computer World Solution, Inc. (the "Debtor" or the "Plaintiff") in the United States Bankruptcy Court for the Northern District of Illinois by creditors Wells Fargo, Fifth Third Bank, and Yellow Freight, Inc. On November 16, 2007, the Debtor consented to the entry of an order for relief under Chapter 11 of the Bankruptcy Code. On March 25, 2008, the Debtor filed adversary complaint 08-ap-00180 against Apple Fund, L.P. ("Apple Fund") and Astor Partners, LLC ("Astor Partners") (collectively, the "Defendants"). Count I of the complaint alleges that the Debtor made preferential transfers to the Defendants that are avoidable under 11 U.S.C. § 547. Count II of the complaint requests recovery of the transfers under 11 U.S.C. § 550(a)(1). Count III requests that the Defendants' claims against the

1

Debtor's bankruptcy estate be disallowed under 11 U.S.C. § 502(d) because the Defendants have

failed to repay the amount of the transfers in question. The complaint is based on three transfers

that the Debtor made to the Defendants between August and September of 2007 in the following

sums: Transfer #1 for $200,000 on August 14, 2007; Transfer #2 for $1,200,000 on August 28,

2007; and Transfer #3, made in September 2007, consisting of the Debtor's inventory

(televisions and monitors) that Apple Fund sold to a third party for $103,204. (Joint List of

Stipulated Facts ¶¶ 19-23).

## BACKGROUND

The Debtor was a distributor of flat screen televisions and computer monitors; it

imported its goods from Asia. Transcript of First Day of Trial, January 20, 2010 at 55,

Computer World Solution, Inc. v. Apple Fund, L.P. and Astor Partners, LLC, 08-ap-00180

(hereinafter "Transcript 1"). The Debtor represented that it received goods and resold them to

retailers and that it provided goods by direct shipment from Asia to some of its vendors.[1]

Transcript 1 at 59-60. The Debtor's primary lender was Fifth Third Bank to whom it owed

approximately $20 million when the bankruptcy petition was filed. Transcript 1 at 98.

The parties' business history consists of a single loan transaction. (Joint List of

Stipulated Facts ¶ 39).   On June 30, 2006, the Debtor executed a promissory note in favor of

Apple Fund for $2,200,000 (the "Promissory Note"). (Joint List of Stipulated Facts ¶ 4). On the

same day Apple Fund loaned the Debtor $2,200,000 (the "Loan") as evidenced by the

---

[1] In 2007 Staples placed an order with the Debtor for $16,000,000 worth of computer monitors, but the Debtor did not deliver the items in time for the retailer's Black Friday Thanksgiving Day Sale event. Transcript 1 at 162.

Promissory Note. (Joint List of Stipulated Facts ¶ 5). The Loan's maturity date was June 30,

2007. (Joint List of Stipulated Facts ¶ 6). On or about June 29, 2007 the Debtor and Apple Fund

entered into a Loan Modification Agreement which extended the Loan's maturity date from June

30, 2007 to August 10, 2007. (Joint List of Stipulated Facts ¶¶ 15 and 16). One of the conditions

of the modification was that the Debtor immediately pay $300,000 on the debt; that payment was

made on June 30, 2007 via wire transfer. Transcript of Second Day of Trial, January 21, 2010 at

11, Computer World Solution, Inc. v. Apple Fund, L.P. and Astor Partners, LLC, 08-ap-00180

(hereinafter "Transcript 2"); (Joint List of Stipulated Facts ¶ 17). Robert Stein ("Stein"), the sole

managing member of Apple Fund's general partner Astor Partners, testified that the modification

might not have been granted if the $300,000 payment had not been made. Transcript 2 at 10.

The Loan Modification Agreement of June 29, 2007 was not satisfied on its due date of August

10, 2007. Transcript 2 at 31. A Second Loan Modification Agreement was also discussed at

trial. It was not signed by the parties. The Second Loan Modification Agreement extended the

maturity date to August 31, 2007 and provided as follows regarding the interest rate:

> 8.2.1: If the Borrower pays to Lender at least $1,200,000 of the total remaining
> outstanding principal amount on or prior to August 17, 2007, the Interest Rate due on the
> outstanding principal amount of the Loan shall be $1,000 per day for each and every day
> after August 10, 2007 through the Second Extended Maturity Date that any amounts
> remain due and owing under the Loan Documents, as modified.

> 8.2.2: If the Borrower pays to Lender at least $1,200,000 of the total remaining
> outstanding principal amount on or prior to August 24, 2007, the Interest Rate due on the
> outstanding principal amount of the Loan shall be $1,750 per day for each and every day
> after August 10, 2007 through the Second Extended Maturity Date that any amounts
> remain due and owing under the Loan Documents, as modified.

> 8.2.3: If the Borrower has not paid to Lender at least $1,200,000 of the total remaining
> outstanding principal amount on or prior to August 24, 2007, the Interest Rate due on the
> outstanding principal amount of the Loan shall remain at $3,000 per day for each and
> every day after August 10, 2007 through the Second Extended Maturity Date that any

3

amounts remain due and owing under the Loan Documents, as modified.

8.3: The defined term "Default Rate" under the Note shall be amended to $5,000 per day for each day after the Second Extended Maturity Date (or such lesser sum permitted by applicable law).

On September 25, 2007, Apple Fund initiated a Verified Complaint and Confession on Judgment Note (the "state court complaint") against the Debtor, in which Apple Fund sought a judgment on the Promissory Note and the Loan Modification in the amount of $493,591. On October 5, 2007, the Circuit Court of Cook County, Illinois, entered a final judgment on the state court complaint in favor of Apple Fund and against the Debtor in the amount of $493,955, plus post-judgment interest. (Joint List of Stipulated Facts ¶¶ 25 and 26).

The parties have stipulated to certain facts regarding the Transfers. The Transfers were made to Apple Fund during the preference period. (Joint List of Stipulated Facts ¶ 37). Neither of the Defendants provided the Debtor with any subsequent advances of funds, goods, or services after August 14, 2007, the date of Transfer #1. (Joint List of Stipulated Facts ¶ 27). The Transfers were made to or for the benefit of Apple Fund on account of an antecedent debt owed by the Debtor to Apple Fund before such Transfers were made. (Joint List of Stipulated Facts ¶¶ 35 and 36). Prior to receiving the Transfers, Apple Fund engaged in collection efforts to obtain payment on account of the Loan. (Joint List of Stipulated Facts ¶ 24). The Defendants have not paid or surrendered the cash Transfers or the value of the Inventory Transfers to the Debtor. (Joint List of Stipulated Facts ¶ 38).

At trial, the court ruled on several motions in limine before testimony began. The Debtor brought two motions: (1) a Motion in Limine to Preclude Defendants' Testimony and Evidence Challenging Plaintiff's Insolvency During the Preference Period and (2) a Motion in Limine to

4

Preclude Testimony and Evidence Relating to Plaintiff's Purported Fraud Against Defendants.

The court granted the motion to preclude testimony and evidence challenging the Debtor's

insolvency because the Defendants admitted that the Debtor was insolvent in their response to

the Debtor's motion for summary judgment. Transcript 1 at 6. The Defendants argued that their

position on insolvency had changed because the Debtor's former officers pleaded the Fifth

Amendment when they were deposed. The court determined that there was no reason to ignore

the Defendants' judicial admission of the Debtor's insolvency.[2] Transcript 1 at 15. Relying on

*Raleigh Stoecker v. Mid American National Bank & Trust Co. (In re Stoecker)*, 131 B.R. 979

(Bankr. N.D. Ill. 1991), the court granted the motion to exclude Defendants' fraud defenses.

Fraud, laches, equitable estoppel, judicial estoppel and unclean hands are not valid defenses to a

preference action under 11 U.S.C. § 547(c). The Defendants did not respond to the motion to

exclude evidence relating to invalid defenses. Transcript 1 at 18.

The Defendants brought a Motion to Approve the Testimony of Gary Dressler

("Dressler"). Dressler prepared an appraisal for Apple Fund in 2007 and was listed on the

Defendants' may-call witness list. The Debtor argued that Dressler was never disclosed as a

potential witness, that the Debtor did not learn of his involvement until the Defendants' pre-trial

material was submitted, and thus that the Debtor had no opportunity to depose or to interview

Dressler. Transcript 1 at 20. The Defendants countered that they would have mainly called

Dressler to testify regarding the Debtor's insolvency but that given the court's ruling on

insolvency, his testimony was less important. Transcript 1 at 21. The court denied the

---

[2] The court determined that the negative inference from the former officers' assertion of the Fifth
Amendment could not be drawn against the Debtor because the Debtor never exercised control over them. The
Debtor's case was initiated as an involuntary case and the former officers never had an interest that was consistent
with the Debtor's.

Defendants' motion, in part, but granted the Defendants leave to call Dressler as a witness

should they need his testimony regarding an issue other than insolvency.

At trial, the Debtor presented documentary evidence in support of its prima facie case. In

evidence are the Joint List of Stipulated Facts (Docket No. 76, 08 A 180) and the Debtor's

schedules showing assets of $4,122,949.16 and liabilities of $37,318,261.70 to establish

insolvency (Docket No. 39, 07 B 21123). Also in evidence are the Defendants' Answers to

Plaintiff's Statement of Facts in which the Defendants admitted that the Debtor was insolvent

during the preference period. (Docket No. 46 at ¶ 33, 08 A 180). The evidence includes two

checks, the first from Staples to the Debtor in the amount of $1,577,475, issued on August 15,

2007, and the second from Butler Sales & Service, LLC ("Butler") to the Debtor in the amount

of $4,140, also issued on August 15, 2007. (Plaintiff Ex. 8). The Debtor argued that these

checks were the source of the funds for Transfer #1 and Transfer #2. *See* Plaintiff's Exhibit List,

admitted into evidence on January 21, 2010. Transcript 2 at 50.

The Plaintiff also offered the testimony of two witnesses at trial. The first witness was

Latifa Kulauzovic ("Kulauzovic"), the Assistant Branch Manager at the Citibank location where

the Debtor maintained an account. The second witness was Patrick O'Malley ("O'Malley"), the

Chief Financial Officer and senior consultant at Development Specialists, Inc., the assignee of

the Debtor's assets since October 29, 2007.

Kulauzovic testified that she has been an Assistant Branch Manager at Citibank for

almost 10 years. Transcript 1 at 32. She also verified the authenticity of the Debtor's bank

statements. (Plaintiff Ex. 7; Transcript 1 at 37). Kulauzovic explained that the initial $1,200,000

check that the Debtor issued to Apple Fund was not honored because the $1,577,475 check from

Staples had not cleared. Transcript 1 at 37-39. Instead, a hold was placed on the check from

Staples resulting in the funds not being available when Apple Fund deposited the $1,200,000

check it received from the Debtor. *Id*.

O'Malley was the Plaintiff's expert witness in forensic accounting and business

restructuring. His background as a Certified Public Accountant and financial advisor to

companies in financial distress qualified him to testify as an expert witness regarding the

Debtor's pre-petition and post-petition financial affairs. Transcript 1 at 47-49. O'Malley

testified that he has reviewed and managed the Debtor's financial affairs since his appointment

on November 2, 2007 as assignee for the benefit of the Debtor's creditors. Transcript 1 at 45-46.

He further testified that in his capacity as assignee he reviewed the Debtor's records as far back

as 2005 and discovered that the Debtor's officers had engaged in fraud. According to O'Malley

the Debtor created fictitious sales and accounts receivable. Transcript 1 at 60-62.

O'Malley was retained by the Debtor pre-petition to help it negotiate with Fifth Third

Bank as replacement financing was being sought. Transcript 1 at 57. O'Malley's firm

negotiated a forbearance agreement with Fifth Third Bank because the bank had initiated

proceedings against the Debtor. Under that agreement the Debtor was to cooperate and provide

information to the bank's auditors, including verification of its accounts receivable. Transcript 1

at 57. The Debtor was also required to close its Citibank account and move all funds to Fifth

Third Bank. Transcript 1 at 99. O'Malley testified that his examination of the Debtor's conduct

and practices revealed that the Debtor's financial statements were false, that the Debtor issued

fraudulent invoices and that some of the Debtor's purported customers were non-existent. He

stated that he discovered this when he tried to contact the Debtor's purported customers to verify

the accounts receivable. Transcript 1 at 57-58.

Kevin Gore ("Gore"), the Debtor's chief operating officer/chief financial officer, steered O'Malley toward the Debtor's smaller customers. Transcript 1 at 58. O'Malley discovered that there was no direct ship business at all. Transcript 1 at 60. Gore became an impediment to O'Malley's efforts and was fired when O'Malley complained to Noel Yuan ("Yuan"), the Debtor's president.

O'Malley discovered that 10% of the boxes purported to be merchandise in the Debtor's warehouse were actually empty. Transcript 1 at 64-65. O'Malley discovered that the Debtor had overstated its sales for 2006 by $47,000,000. He discovered that the Debtor overstated its sales for 2007 by $63,000,000. Transcript 1 at 60. These overstatements represented a massive fraud. O'Malley filed amended tax returns on the Debtor's behalf and secured a federal income tax refund of approximately $1,000,000. Transcript 1 at 84.

During his pre-petition work with the Debtor, O'Malley had been told that the Citibank account was for international transactions. He subsequently discovered that the Citibank account was used to hide transactions from Fifth Third Bank, the Debtor's primary lender. O'Malley opined that the separate Citibank account was used to perpetuate the fraud and that as part of the fraud, funds were continually transferred back and forth between Fifth Third Bank and Citibank as support for the fake accounts receivable. He further opined that the purpose of the Citibank account was to make such transfers and to keep them off the books. Transcript 1 at 73.

With regard to the Debtor's dealings with Apple Fund, O'Malley testified that the Debtor did not account for the Loan as a typical loan on its books and records. Transcript 1 at 67. Rather, it was recorded as a receivable from a non-existent customer. O'Malley testified that

8

while the Debtor made required quarterly payments to Apple Fund, those payments were treated as commission expenses and were not recorded in the company's books, records or financial statements as loan payments. Transcript 1 at 78. The Transfers at issue herein were put in a suspense account. Transcript 1 at 79. O'Malley opined that the treatment and recording of the Debtor's payments to Apple Fund and the Transfers were not ordinary. Transcript 1 at 79. The payments and Transfers were made to conceal the Loan from the Debtor's senior, primary lender, Fifth Third Bank. Transcript 1 at 80. O'Malley also testified that Transfer #1 for $200,000 on August 14, 2007 and Transfer #2 for $1,200,000 on August 28, 2007, both to Apple Fund, were not reflected in the Debtor's bank statements. He verified the payments through examination of the records of the Citibank account. O'Malley testified that it was his expert opinion that there was nothing ordinary about how the Loan was treated by the Debtor. Transcript 1 at 69.

O'Malley also opined that it was unusual that Apple Fund did not file a Uniform Commercial Code financing statement. He noted that where there is a second lender, he would expect to see a subordination agreement or an intercreditor agreement between the lenders, neither of which exists for the parties' Loan. Transcript 1 at 179. A question was raised at trial about whether the interest rate on the Apple Fund Loan was usurious. Illinois' usury statute, 815 ILCS 205/4, provides that it is lawful to charge any rate of interest in connection with a loan made to a corporation, which the Debtor declares itself to be in its bankruptcy petition. There is nothing extraordinary about the interest rate charged on the funds loaned by Apple Fund.

Finally, O'Malley testified that Apple Fund received more during the preference period than it would have in a Chapter 7 liquidation and distribution. Transcript 1 at 87-88. Instead of

9

receiving almost 75 cents on the dollar as it did during the preference period, Apple Fund would have received only 9 cents on the dollar in a liquidation of the Debtor's assets, O'Malley stated.

Stein, the sole managing member of Apple Fund's general partner Astor Partners, testified for the Defendants. Stein stated that at the Loan's inception the Debtor wanted a term of more than one year and that Stein did not expect payment on the due date. Transcript 2 at 15-17. Stein did not know whether the Second Loan Modification Agreement was ever executed. Transcript 2 at 96. He testified that although the Second Loan Modification is unsigned, the parties acted as if they had signed it. Transcript 2 at 20.

Stein also testified that his firm has previously modified loans by extending them and charging interest upon modification as it did with the Debtor. However, he could not say how others in the lending industry handled loans such as these. Transcript 2 at 26. Stein did not hold himself out as an expert in lending; he testified that he is an expert in investment management. Transcript 2 at 26.

According to Stein after Apple Fund received the $1,200,000 Transfer on August 28, 2007, it claimed that additional amounts were owed, but received no further cash or wire transfers from the Debtor. However, Apple Fund did receive the Debtor's inventoried items on one or more occasions in September 2007. Stein testified that it was not ordinary for his firm to pick up inventory and that the firm had not picked up inventory before from Apple Fund's other borrowers. Transcript 2 at 38. Stein was not aware that the inventory that Apple Fund seized could have been Fifth Third Bank's collateral under that lender's blanket lien. Transcript 2 at 106-107.

### DISCUSSION

10

**Plaintiff's Prima Facie Case**

To obtain judgment, the Plaintiff must satisfy the requirements of Section 547(b) of the

Bankruptcy Code which governs avoidable preferential transfers. Section 547(b) provides as

follows:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made–
>>> (A) on or within the 90 days before the date of the filing of the petition; or
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> (5) that enables such creditor to receive more than such creditor would receive if –
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer had not been made; and
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

In this case, the Plaintiff has met its burden and proved all of the elements of a

preferential transfer with respect to each of the Transfers. The parties stipulated to several of the

Section 547 elements in their Joint List of Stipulated Facts, including the following: (1) Apple

Fund was a creditor of the Debtor at the time of the Transfers; (2) the Transfers were made to or

for the benefit of Apple Fund; (3) the Transfers were made during the preference period; and (4)

the Transfers were made to Apple Fund on account of an antecedent debt owed by the Debtor to

Apple Fund before such Transfers were made. (Joint List of Stipulated Facts ¶¶ 34-37). Further,

Apple Fund admitted that the Debtor was insolvent during the preference period in its Answers

to the Plaintiff's Statement of Facts. (Docket No. 46, ¶ 33, 08 A 180). Thus, the Debtor had to

prove only two Section 547 elements at trial - that the Transfers were interests of the Debtor in

property and that the Transfers enabled Apple Fund to receive more than it would have received

if this case had been a Chapter 7 liquidation.

The Defendants denied that Transfer #1 and Transfer #2 funds were interests of the

Debtor in property by raising the earmarking doctrine as an affirmative defense. However, the

earmarking doctrine is not an affirmative defense pursuant Section 547 of the Bankruptcy Code.

It is a challenge to a plaintiff's ability to prove its prima facie case. *See Kmart Corp. v. Undien

Am. Corp. (In re Kmart Corp.)*, No. 04 C 4978, 2004 WL 2222265, at *3 (N.D. Ill. Oct. 1, 2004).

The earmarking doctrine "is applicable only where a third party lends money to the debtor for

the specific purpose of paying a selected creditor." *In re Smith*, 966 F.2d 1527, 1533 (7th Cir.

1992). An earmarked transfer is not a preferential transfer because "(1) the debtor never

exercises 'control' over the new funds; and (2) the debtor's property (i.e., the fund out of which

creditors can be paid) is not diminished." *Id.*

The Defendants alleged that the earmarking doctrine was applicable to the cash transfers

(Transfer #1 and Transfer #2) because the funds were given to the Debtor by Yuan's family to

pay Apple Fund. However, the evidence presented at trial negates the Defendants' earmarking

argument and proves that Transfer #2 came from payments that the Debtor received from Staples

and from Butler Sales, not from Yuan's family. Kulauzovic testified that the funds in the

Debtor's bank account that were used to pay Transfer #2 of $1,200,000 came from a $1,577,475

check from Staples. Transcript 1 at 39. O'Malley testified that the source of Transfer #2 was the

check that the Debtor received from Staples as payment for goods sold. Transcript 1 at 71-72.

The earmarking doctrine is inapplicable here as to Transfer #1 and Transfer #2 because there is

no evidence to counter the Debtor's position that the Debtor exercised complete control and

ownership of the funds in issue. Based on the testimony provided by Kulauzovic and O'Malley,

the funds used to pay Transfer #1 and Transfer #2 were deposited directly into the Debtor's bank

account for general business purposes. There was no testimony or evidence presented to show

that these funds were specifically earmarked for Apple Fund from Yuan's family. The court

finds that the Debtor presented sufficient evidence and testimony at trial to prove that the Debtor

had a property interest in the funds used for Transfer #1 and Transfer #2 and that the earmarking

doctrine does not apply to those funds.

The court also finds that the Debtor presented sufficient evidence at trial to prove that

Apple Fund received more from the preferential Transfers than it would have received in a

Chapter 7 liquidation and distribution. The standard for determining whether a creditor received

more from preferential transfers than it would have in a Chapter 7 liquidation is "whether the

general unsecured creditors would receive less than 100% recovery on their claims." *Maxwell

v. IDC (In re marchFirst, Inc.)*, 381 B.R. 689, 695 (Bankr. N.D. Ill. 2008) (internal citations

omitted). Generally, "so long as the distribution to creditors in a bankruptcy case is less than

100%, 'any payment on account to an unsecured creditor during the preference period will

enable that creditor to receive, for preference-avoidance purposes, more than it would have

received in a hypothetical chapter 7 liquidation had the payment not been made.'" *Id.* Here, the

Debtor's schedules clearly show that the Debtor's liabilities ($37,318,261.70) greatly

outweighed its assets ($4,122,949.16) so general unsecured creditors will receive much less than

100% on their claims.  O'Malley testified that Apple Fund would have received only 9 cents on

the dollar in a Chapter 7 liquidation, compared to the 75 cents on the dollar Apple Fund received

from the Transfers.  Transcript 1 at 87-88.


**Ordinary Course of Business Defense**

The Defendants assert an Affirmative Defense of ordinary course of business pursuant to

11 U.S.C. § 547(c)(2).  Section 547(c)(2) provides as follows to establish an ordinary course of

business defense:

> (c) The trustee may not avoid under this section a transfer–
>                         * * *
> (2) to the extent that such transfer was in payment of a debt incurred by
> the debtor in the ordinary course of business or financial affairs of the
> debtor and the transferee, and such transfer was--
>> (A) made in the ordinary course of business or financial affairs of
>> the debtor and transferee; or
>> (B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

To establish this defense, a Defendant must prove that the debt for which a transfer was made

was incurred in the ordinary course of business between the debtor and creditor and that either

(1) the transfer was made in the ordinary course of business of the parties or (2) the transfer was

made according to ordinary business terms in the creditor's industry.   The court finds that the

Defendants failed  to prove either prong of the ordinary course of business defense, as discussed

below.

     1.     <u>Debt Incurred in Ordinary Course of Business of the Debtor and Creditor</u>

Pursuant to 11 U.S.C. § 547(c)(2), the Defendants must prove that the Transfers were

made in payment of a debt incurred by the Debtor in the ordinary course of business or financial

affairs of the Debtor and the transferee. Based on the testimony of O'Malley, the Loan was not

incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and

Apple Fund. The Debtor did not reflect on its books and records that it had received a loan from

Apple Fund. Instead, the money from Apple Fund on account of the Loan was recorded as cash

received on an outstanding account receivable. Furthermore, the Transfers at issue were never

recorded on the Debtor's books and were, instead, placed in a suspense account. Transcript 1 at

78-79.

When the Debtor received the $2,200,000 from the Defendants, the funds were reflected

on the Debtor's records as an account receivable from Insight Enterprises ("Insight") as a sale of

merchandise rather than as a loan from Apple Fund. O'Malley testified that Insight was a

fictitious customer and that the loan proceeds were used to support a fraudulent sale transaction.

Transcript 1 at 188-189.

The court finds that the circumstances surrounding the Loan's inception and repayment,

as well as its recording in the Debtor's books and records, are fraudulent. A debt cannot be

incurred in the ordinary course of business where the debtor engaged in fraudulent conduct. *See,*

*e.g., Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339-40 (10th Cir. 1996)

(determining that the ordinary course of business defense is not applicable to payments by a fake

business set up to defraud people)*; Henderson v. Buchanan*, 985 F.2d 1021, 1025 (9th Cir.

1993) (concluding that the ordinary course of business defense is not applicable to Ponzi scheme

investors because a Ponzi scheme is not a business). This court concludes that the debt was not

incurred in the ordinary course of business due to the fraud surrounding the Loan. The purpose

of the ordinary course defense is to leave undisturbed normal financial relations, because the

15

defense does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy. S.Rep. No. 95-989. 95th Cong., 2d Sess. 88 (1978). 1978 US Code Cong. & Admin.News, p.5874.

The Defendants have failed to satisfy the Section 547(c)(2) requirement that the transfer be in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee.

2.    Transfer Made According to Ordinary Course of Business of the Parties

Pursuant to 11 U.S.C. § 547(c)(2)(A), for transfers to be eligible for the exception to liability they must be "made in the ordinary course of business or financial affairs of the debtor and the transferee." Here, the Loan between the Debtor and Apple Fund is the only business transaction between the parties. The Seventh Circuit has provided guidance regarding how to assess the ordinary course of business between parties when their business history consists of a single transaction. In *Kleven v. Household Bank F.S.B.*, the Seventh Circuit affirmed a finding that one business transaction between the parties was enough to determine that the transfers at issue were made in the ordinary course of business of the parties and thus could not be avoided as preferential. 334 F.3d 638, 643 (7th Cir. 2003). The single transaction involved a refund anticipation loan ("RAL") which the debtor applied for and obtained during the preference period. *Id.* at 639. The debtor received a loan against his forthcoming tax refund and established a bank account with the lender so that the lender would automatically receive the debtor's electronic federal income tax refund and apply it to the loan. *Id.* at 640.

In determining whether the transaction was ordinary as between the lender and the debtor, the court considered several factors:

16

"(1) the length of time the parties were engaged in the transaction at issue;

(2) whether the amount or form of tender differed from past practices;

(3) whether the debtor or creditor engaged in any unusual collection or payment

activity;

and

(4) whether the creditor took advantage of the debtor's deteriorating financial

condition."

*Id.* at 642.  While the court stated that the strongest factor supporting a determination that

business between a debtor and a creditor is ordinary is the history of dealing between the parties,

the court noted that "[i]n some instances, ... the ordinary course of business may be established

by the terms of the parties' agreement, *until that agreement is somehow or other modified by*

*actual performance." Id.* at 642-643 (emphasis added).   Because there was no modifying

behavior between the debtor and creditor in *Kleven*, the Seventh Circuit determined that it was

appropriate to "look to the terms of the parties' agreement in order to determine their ordinary

course of business." *Id.*  Looking to the RAL agreement between the parties for guidance, the

court found that because the transaction at issue was conducted according to the parties'

agreement with regard to timing and manner, the transfers were ordinary as between the parties.

*Id.*

Using the *Kleven* principles as a guide, the court concludes that the Transfers in this case

were not made in the ordinary course of business between the Debtor and Apple Fund.

Although, like the debtor and creditor in *Kleven*, the business history between the Debtor and

Apple Fund consisted of a single transaction, their transaction is not similar to the transaction in

17

*Kleven* for several reasons. First, the Seventh Circuit noted in *Kleven* that engaging in unusual collection activity is one of the factors to consider when determining whether the transaction was ordinary as between the parties. *Id.* at 642. This court finds that Apple Fund engaged in unusual collection activity when it initiated collection efforts with respect to the Loan and obtained a state court judgment against the Debtor for monies owed. Second, the Seventh Circuit noted in *Kleven* that looking to the terms of the parties' agreement to establish the ordinary course of business is appropriate in the absence of modifying behavior. *Id.* at 643. In the instant case the parties engaged in significant modifying behavior. The parties entered into two loan modifications which altered their agreement. One modification occurred in June 2007, well before the preference period. The second modification occurred on August 10, 2007, one day before the preference period began.

The Seventh Circuit has addressed the issue of whether payments that are late in violation of the terms of the parties' agreement can ever be in the ordinary course of business. *In the Matter of Xonics Imaging, Inc.*, 837 F.2d 763, 766 (7th Cir. 1988). Prior to the preference period the *Xonics* debtor made one timely, pre-petition payment to the creditor. *Id.* at 767. However, during the preference period, all of the debtor's payments were late by the terms of the parties' initial agreement and subsequent modifications. *Id.* at 766. The Seventh Circuit held that "the conduct of a debtor, after becoming insolvent, in failing to make payments within the time required by its contract with the creditors is presumptively nonordinary." *Id.* at 767. The court determined that this presumption was triggered by the conduct of the *Xonics* debtor and that the creditor failed to carry its burden of proving that the late payments were in the ordinary course of the business of the debtor. *Id.*

18

Similarly, this court finds that the parties' conduct during the preference period triggers
the nonordinary presumption noted in *Xonics*. Pursuant to the original contract between the
Debtor and Apple Fund, payment of the Loan was due in full by June 30, 2007. Like the debtor
in *Xonics*, the Debtor made timely quarterly payments to Apple Fund outside of the preference
period pursuant to the Promissory Note. One day before the maturity date of the Loan, the
parties entered into the Loan Modification Agreement which extended the due date to August 10,
2007. According to Stein, the Loan Modification Agreement was not satisfied by its maturity
date, causing the parties to enter into the unsigned Second Loan Modification Agreement on
August 10, 2007. Transcript 2 at 31. Although Apple Fund received a $200,000 payment from
the Debtor on or around August 14, 2007, this payment was not provided for in either of the
Loan Modification Agreements. Each modification required full repayment of the Loan by each
maturity date. The Loan was not repaid by August 10, 2007 or by August 31, 2007. Looking to
the agreements to assess ordinariness, Transfer #1 was not made pursuant to the parties'
agreement. Transcript 2 at 32. During the preference period, the Plaintiff made the Transfers at
issue herein but they did not satisfy the requirement that the Loan be fully repaid by the due
dates. This court finds that the Debtor's failure to make full payment during the preference
period triggers the *Xonics* nonordinary presumption because the Agreements were violated.
After receiving Transfer #2 of $1,200,000, but before the Debtor filed for bankruptcy, Apple
Fund initiated a state court action against the Debtor and was awarded $493,955 because of the
Debtor's failure to make payments pursuant to the Loan agreement and its subsequent
modifications. This collection effort was not ordinary; it occurred during the preference period.

In *Roberds, Inc. v. Broyhill Furniture (In re Roberds)*, the court set forth instructive

19

guidelines for use in determining whether transfers are made in the parties' ordinary course of

business.  315 B.R. 443, 458 (Bankr. S.D. Ohio 2004).  The guidelines are as follows:

| POTENTIALLY ORDINARY CREDITOR ACTIVITY | POTENTIALLY *NOT* ORDINARY CREDITOR ACTIVITY |
|---|---|
| **creditor question**<br><br>When will payment due according to the existing terms be received? - even if this question concerning payment had never been previously asked. | If payment for an antecedent debt is not received according to its terms and any one, some or all of the following activities are present, the payment may not be in the ordinary course of the parties' business: |
| **creditor communication**<br><br>There is increased concern about receipt of | 1. creditor change from prior or existing credit *terms*. |
| payment due according to existing terms – even if such a concern had never been | 2. creditor change from prior or existing *limits*. |
| previously expressed.<br><br>**creditor frequency** | 3. creditor change from prior or existing *sales* of goods and services. |
| There are repeated requests for payment or expressions of concern about payment due | 4. creditor change from prior or existing *shipment* of goods and services. |
| according to existing terms – even if there had never been such repeated requests. | 5. creditor change from the existing required *amounts* of payments to be made. |
| **identity of creditor contact**<br><br>There is contact by senior management or a | 6. creditor change from the existing required *timing* of payments to be made. |

| | |
|---|---|
| creditor representative with increased authority involving credit decisions concerning payment due according to existing terms – even if there was never contact by such senior management or a creditor representative. | 7. creditor changes in *future* credit terms, limits, sales, shipments, the amount of payments required or the timing of payments. |

*Id.*

The *Roberds* court's guidelines take into account the delicate balance between collection activities designed to protect the creditor and its business and collection activities that are out of the ordinary. As the court recognized in *Roberds*, creditors may have to engage in collection activities in the ordinary course of business to protect themselves and to receive payment. However, when a creditor engages in modifying behavior and changes some aspects of the parties' agreement, these changes are likely not ordinary creditor activity.

Here, Apple Fund engaged in collection activity in addition to modifying behavior. Apple Fund and the Debtor entered into two loan modifications that changed the terms of their agreement. As part of the modifications, the amounts of the payments to be made changed and the timing of the payments changed. For instance, the first Loan Modification triggered a $300,000 payment from the Debtor to Apple Fund which was not contemplated by the parties' initial agreement. In addition, the maturity date of the loan changed from June 30, 2007 to August 10, 2007. The Second Loan Modification extended the Loan's maturity date from August 10, 2007 to August 31, 2007.

Consistent with the court's guidelines in *Roberds*, this court finds that the multiple

21

modifications to the agreement between Apple Fund and the Debtor went beyond ordinary

collection efforts and significantly changed the parties' payment practices. Transfer #1 on

August 14, 2007, which was made during the preference period, resulted from nonordinary

collection activity, mainly the two agreement modifications. Transfer #2 on August 28, 2007,

which was also made during the preference period, resulted from the same nonordinary

collection activity. Therefore, the Transfers were not made in the ordinary course of business of

the parties.

The court feels compelled to address an argument raised by the Defendants in their

closing remarks regarding the Debtor's ordinary course of business being fraudulent. The

Defendants' attorney argued:

> But the interesting thing that I take from that is if you really think about it, the ordinary
> course of business, they kind of can't have it both ways, which is if this was such a fraud
> that started in 2005, long before this loan was even made, to the tune, as Mr. O'Malley
> said yesterday, that they booked $80 million, approximately $80 million of revenue, of
> which $60 million was bogus, that they had approximately $20 million of real sales, $60
> million in fake sales, well, if that's really the case, and they're hanging their hat on the
> fact that, well, they booked the loan as if it wasn't a loan, as if it was something else, then
> it actually begs the interesting question, if the business is so fraudulent, and such – and
> such – such bad record keeping, then in a sense this loan was also made in the ordinary
> course of their fraudulent business at the end of the day. So if that's how they conducted
> business since long before this loan was made, then it was paid as they normally conduct
> a fraudulent business. So either way, either this loan was repaid in strict accordance with
> the business terms, the loan terms I should say, or if not, if it was so out of whack, it was
> repaid in conformance with the business that conducts – I mean, it's not something you
> see every day, but it was paid in conformance with the business that conducts a massive
> fraud and has lots and lots of victims, including Apple Fund.

Transcript 2 at 163-165. This court notes that the exception to preference liability applies to

payments made by a legitimate business, not payments made by a fraudulent business. The

measure of business conduct for purposes of this defense should be limited to the legitimate

practices of legitimate businesses. This court declines to apply the Defendants' reasoning;

22

ordinary businesses do not pay fictitious profits or systematically defraud their customers or their lenders. *See, e.g., M & L Bus. Mach. Co.*, 84 F.3d at 1340 (holding that ordinary businesses do not pay fictitious profits).

This court finds that Apple Fund's collection activity and the parties' modifying behavior with regard to the first and Second Loan Modifications indicate that the Transfers were not made according to the ordinary course of business of the parties. Based on this activity, the court concludes that the Transfers are nonordinary. The Defendants have failed to meet their burden on this element of the ordinary course of business defense, which requires that transfers be made in the ordinary course of business of the parties.

3.    Transfer Made According to Ordinary Business Terms

The phrase "ordinary business terms" in 11 U.S.C. § 547(c)(2)(B) refers to "a range of payment terms encompassing the practices of firms similar to that creditor." *marchFirst*, 381 B.R. at 696. The Seventh Circuit has determined that in order for a creditor to prevail on this element of the ordinary course of business defense, "the creditor need establish only that its own dealings with the debtor are situated 'within the outer limits of normal industry practice.'" *In the Matter of Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir. 1995). The court further explains that satisfaction of the ordinary business terms element "requires proof beyond what is normal between the debtor and the creditor: The creditor must also show that the disputed payment was made according to terms that are ordinary when compared to those employed by other firms in the same industry." *Id.* at 798 (citing *In re Tolona Pizza*, 3 F.3d 1029, 1032-33 (7th Cir. 1993)).

No evidence was presented in support of the allegation that the Transfers between Apple Fund and the Debtor were made according to terms that are ordinary when compared to terms

used by firms in the same industry.  The Defendants' sole trial witness, Robert Stein, admitted

during his testimony that he could not comment on how other banks or firms in the industry

handle loans of the kind that Apple Fund made to the Debtor.  Transcript 2 at 26.  While Stein

was able to provide general testimony regarding Apple Fund's practices with other customers

and the Debtor, the Seventh Circuit "requires proof beyond what is normal between the debtor

and the creditor" to satisfy the ordinary business terms element of the ordinary course of

business defense.  *See Midway Airlines*, 69 F.3d at 798.  Stein's testimony regarding industry

practices was wholly inadequate because he never explained how the Transfers were made

according to terms that are ordinary when compared to those employed by other firms in the

same business.  The Defendants failed to advance any evidence to prove that the Transfers were

made according to ordinary business terms.  Thus, the Defendants' Affirmative Defense that the

Transfers were made according to ordinary business terms under Section 547(c)(2)(B) fails.

**Remaining Affirmative Defenses**

The Defendants asserted the following affirmative defenses in their answer to the

adversary complaint:

1.      The alleged Transfers are not avoidable to the extent that they do not involve a

transfer of an interest of the Debtor in property.

2.      The alleged Transfers are not avoidable to the extent that they were not made

within the preference period.

3.      The alleged Transfers are not avoidable to the extent that any such payments: (a)

were intended by the Debtor and Apple Fund to be contemporaneous exchanges

for new value given to the Debtor in the form of forbearance agreements or

otherwise; and (b) were in fact substantially contemporaneous exchanges.

4.   The alleged Transfers were in payment of debt incurred by the Debtor in the
ordinary course of business or financial affairs of the Debtor and Apple Fund and
were made (a) in the ordinary course of business or financial affairs of the Debtor
and Apple Fund, or (b) according to ordinary business terms.

5.   The alleged Transfers are not avoidable to the extent that after such payments
were made, Apple Fund gave new value, either in the form of an agreement to
forbear or otherwise, to or for the benefit of the Debtor, which new value was: (a)
not secured by an otherwise unavoidable security interest; (b) on account of
which new value the Debtor did not make an otherwise unavoidable transfer to or
for the benefit of the Defendants.

6.   The alleged Transfers are not avoidable to the extent that they create a perfected
security interest in inventory or a receivable or the proceeds of either not
otherwise excepted within the limitations of 11 U.S.C. § 547(c)(5).

7.   To the extent that the Debtor and/or its officers, directors, employees or
shareholders perpetuated a fraud on and upon the Defendants whereby they
allowed for the passage of time in order to perpetuate said fraud, the Complaint is
barred by laches.

8.   To the extent that the Debtor and/or its officers, directors, employees, or
shareholders perpetuated a fraud on and upon the Defendants, the Complaint is
barred by the doctrine of equitable estoppel.

9.   To the extent that the Debtor and/or its officers, directors, employees, or

25

shareholders perpetuated a fraud on and upon the Defendants, the Complaint is

barred by the doctrine of judicial estoppel.

10.     To the extent that the Debtor and/or its officers, directors, employees, or

shareholders perpetuated a fraud on and upon the Defendants, the Complaint is

barred by the doctrine of unclean hands.

11.     To the extent that the Transfers originated from or on behalf of parties other than

the Debtor, the alleged Transfers are not avoidable to the extent they are protected

by the earmarking doctrine.

12.     Defendants are entitled to set off any liability imposed upon them in this action

by: (a) any sums due to Defendants as a dividend from the bankruptcy estate for

any pre-petition unsecured claims of Defendants; and (b) any amounts due

Defendants as a dividend from the bankruptcy estate as a result of any recovery

herein.

13.     Defendants reserve their rights to add additional affirmative defenses that may be

ascertained during the course of this litigation.

On June 5, 2008, the Debtor initiated a Motion to Strike Certain of Defendants'

Affirmative Defenses.  Computer World Solution, Inc. v. Apple Fund, L.P. and Astor Partners,

LLC, 08-ap-00180, Docket No. 19.  On June 17, 2008, this court entered an order striking the

Defendants' Second and Thirteenth Affirmative Defenses and requiring that the Defendants

replead their First and Sixth Affirmative Defenses within fourteen days of the entry of the order.

The order also required the Defendants to replead their Seventh, Eighth, Ninth, and Tenth

Affirmative Defenses by March 23, 2009.  Computer World Solution, Inc. v. Apple Fund, L.P.

and Astor Partners, LLC, 08-ap-00180, Docket No. 21.  The Defendants have not reasserted the

First, Sixth, Seventh, Eighth, Ninth or Tenth Affirmative Defenses as required by this court's

order.  Due to the Defendants' failure to replead these Affirmative Defenses in a timely manner

the First, Sixth, Seventh, Eighth, Ninth and Tenth Affirmative Defenses are not in issue.

The Defendants' Second Affirmative Defense that the alleged Transfers are not avoidable

to the extent that they were not made within the preference period fails.  The parties have

stipulated that the Transfers occurred during the preference period.  (Joint List of Stipulated

Facts ¶ 37).

The Defendants' Third Affirmative Defense that the alleged Transfers are not avoidable

to the extent that any such payments:  (a) were intended by the Debtor and Apple Fund to be

contemporaneous exchanges for new value given to the Debtor in the form of forbearance

agreements or otherwise; and (b) were in fact substantially contemporaneous exchanges fails.

The parties stipulated that nothing was exchanged between them after the loaned funds were

transferred to the Debtor.  (Joint List of Stipulated Facts ¶ 27).

The Defendants' Fourth Affirmative Defense, the ordinary course of business defense,

fails.  Its failure has been discussed herein.

The Defendants' Fifth Affirmative Defense that the alleged Transfers are not avoidable to

the extent that after such payments were made, Apple Fund gave new value, either in the form of

an agreement to forbear or otherwise, to or for the benefit of the Debtor, which new value was:

(a) not secured by an otherwise unavoidable security interest; (b) on account of which new value

the Debtor did not make an otherwise unavoidable transfer to or for the benefit of the Defendants

fails.  The parties stipulated that no new value was exchanged between them following the Loan.

(Joint List of Stipulated Facts ¶ 27).  The law does not recognize forbearance as a defense to a preference claim.  Several bankruptcy courts have determined that forbearance of a right does not constitute new value.  *See, e.g., In re Duffy*, 3 B.R. 263, 266 (Bankr. S.D.N.Y. 1980) (car lessor's forbearance from repossessing vehicle did not constitute new value); *Wolinsky v. Central Vt. Teachers Credit Union (In re Ford)*, 98 B.R. 669, 683-684 (Bankr. D. Vt. 1989) ("[F]orbearance, whether consensual/nonconsensual, direct/indirect, unilateral/bilateral, or intentional/unintentional, may not constitute new value under § 547(a)(2) for § 547(c)(4) purposes").

The Defendants' Eleventh Affirmative Defense, the earmarking defense, fails.  Its failure has been discussed herein.

The Defendants' Twelfth Affirmative Defense alleges that the Defendants are entitled to set off any liability imposed upon them in this action by: (a) any sums due to Defendants as a dividend from the bankruptcy estate for any pre-petition unsecured claims of Defendants; and (b) any amounts due Defendants as a dividend from the bankruptcy estate as a result of any recovery herein.  *See Stoecker*, 131 B.R. at 984 (explaining that only defenses noted in 11 U.S.C. § 547(c) are allowable to avoid preference liability).  The defense of setoff is not provided for in Section 547(c).  The Defendants have not filed claims against the bankruptcy estate.


## CONCLUSION

The court finds that the Debtor has met its burden under 11 U.S.C. § 547 and has proved by a preponderance of the evidence that the Transfers were in fact preferential.  None of the Defendants' defenses has been sustained by a preponderance of the evidence, and thus, this court

28

enters judgment in favor of the Plaintiff and against the Defendants.

On Count I the court avoids the following three transfers:

(1) $200,000 dated August 14, 2007;

(2) $1,200,000 dated August 28, 2007; and

(3) $103,204 represented by the transfer of inventory during September 2007.

Plaintiff Computer World Solution, Inc. is granted judgment against the Defendants Apple Fund,

L.P. and Astor Partners, LLC on Count I in the amount of $1,503,204, together with interest

pursuant to 28 U.S.C. § 1961 and the costs of this proceeding.

On Count II judgment is entered in favor of the Plaintiff Computer World Solution, Inc.

and against the Defendants Apple Fund, L.P. and Astor Partners, LLC.  The Plaintiff Computer

World Solution, Inc. may recover the Transfers avoided in Count I from the Defendants Apple

Fund, L.P. and Astor Partners, LLC.

Count III asks the court to disallow the Defendants' claims against the bankruptcy estate

because the preference claims have not been paid pursuant to 11 U.S.C. § 502(d).  The

Defendants have not filed claims against the bankruptcy estate.  No relief under Count III is

called for.

The Debtor's Motion for Summary Judgment, which was heard by the court concurrent

with the trial, is denied.  The court finds that the several issues of fact noted herein preclude the

entry of summary judgment.

The court denied the Defendants' oral request to delay the trial to enforce a subpoena

served on Danny Zoller ("Zoller") who is an attorney who once worked for the Defendants.  This

adversary proceeding had been pending for 22 months by the date of this oral request.  The court

was not informed at the start of the trial that Zoller's attendance would be a problem. The court

stated on page 130 of Transcript 2 that if it had been told of this problem at the outset of the trial

it would have delayed the trial to enforce the subpoena. The Defendants' attorney stated that

Zoller was in California when the trial began. The court was given no proof that Zoller was in

California and notes that the witness could have been deposed under Federal Rule of Bankruptcy

Procedure 7032, which might have allowed the admission of the witness' deposition testimony at

the trial. The court was told that Zoller's testimony would be cumulative. Transcript 2 at 131.

The effort to continue the trial at its conclusion to secure Mr. Zoller's attendance may

have been another attempt to delay this matter. The court continued the trial several times at the

Defendants' request to depose the Debtor's principals, Yuan and Gore, who asserted their Fifth

Amendment privileges against self-incrimination, adding nothing to the resolution of this case.

**Dated: April 15, 2010**          ENTERED: *Jacqueline P. Cox*

_____

**Jacqueline P. Cox**
**United States Bankruptcy Judge**